UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1954(DSD/JGL)

Fireman's Fund Insurance Company,

Plaintiff,

and,

**ORDER**

Travelers Indemnity Company of America, American Economy Insurance Company, American International Recovery, and Home Video of Minneapolis, Inc.,

Plaintiff-Intervenors,

v.

Canon U.S.A., Inc.,

Defendant.

Brian N. Johnson, Esq. and Halleland, Lewis, Nilan, Sipkins & Johnson, 220 Sixth Street South, Suite 600, Minneapolis, MN 55402 and Patrick C. Hess, Esq., Dale F. Weigand, Esq. and Ellison, Nielsen, Knibbs, Zehe & Antas, 100 Monroe Street West, 18th Floor, Chicago, IL 60603, counsel for plaintiff.

David Y. Trevor, Esq., Timothy E. Branson, Esq. and Dorsey & Whitney, 50 Sixth Street South, Suite 1500, Minneapolis, MN 55402-1498 and Dean C. Eyler, Esq., Gray, Plant, Mooty, Mooty & Bennett, 3400 City Center, 33 South Sixth Street, Minneapolis, MN 55402, counsel for Canon U.S.A., Inc.

Kenneth B. Huber, Esq. and Ness & Associates, 6465 Wayzata Boulevard, Suite 450, Minneapolis, MN 55426 and Robert W. Cockerham, Esq., Bradley R. Hansmann, Esdq. and Brown & James, 1010 Market Street, 20th Floor, St. Louis, MO 63101, counsel for Travelers.

Michael Rowley, Esq. and Terhaar, Archibald, Pfefferle & Griebel, 300 First Avenue North, Suite 220, Minneapolis, MN 55401, counsel for American Economy Insurance Company.

FILED OCT 15 2003
Richard D. Sletten, CLERK
Judgment Ent'd. OCT 15 2003
Deputy Clerk's Initials

This matter is before the court upon the motion of defendant Canon U.S.A., Inc. for summary judgment on all claims of plaintiffs and plaintiff-intervenors. Plaintiff Fireman's Fund Insurance Company ("Fireman's Fund") and plaintiff-intervenors Travelers Indemnity Company of America ("Travelers"), American Economy Insurance Company ("American Economy"), American International Recovery, Inc. ("American Recovery") and Home Video of Minneapolis, Inc. ("Home Video") oppose the motion.[1] For the following reasons, defendant's motion for summary judgment is granted.

## BACKGROUND

The litigation arose after a fire occurred in the video rental store of plaintiff-intervenor Home Video on October 16, 2000. Home Video's store was destroyed and other businesses in the building were damaged by the fire. Plaintiffs claim that the fire originated in a defective copying machine made by defendant and owned by Home Video. Plaintiffs allege negligent design, manufacturing and testing, strict products liability and breach of express or implied warranties. Plaintiffs base their claims primarily on the opinions of several fire "origin" experts, who believe that the fire started at or in the immediate vicinity of the copier. Plaintiffs further rely on the reports of two "cause"

[1] Plaintiff and plaintiff-intervenors are hereafter referred to collectively as "plaintiffs."

experts, who theorize that the fire was caused by alleged defects in the device.

**A. The Fire**

At approximately 8:00 p.m. on October 16, 2000, the Home Video store telephones began ringing, the computers froze up and security alarms near the front door began beeping. A few minutes later, a customer reported smelling smoke to employees Ted Kinder ("Kinder") and Aimee Gervais ("Gervais"). The employees then noticed smoke in the back of the store. Kinder went to the back of the store, opened the door to the storage room where the copier was located and discovered a fire in progress. Kinder instructed the customers and Gervais to leave the building. By the time the fire department was able to extinguish the fire, the Home Video store had been destroyed and other businesses in the building had suffered damage.

Home Video employee Gary Baum ("Baum") was the only employee who used the copier on the day of the fire. Baum testified that he had done three copy jobs that day. He made "slip covers" or "jackets" for the video cassettes in the morning, using heavier stock paper. (Pls.' Joint Aff. Ex. 6, Baum Dep. at 59-61.) At around 12:30 in the afternoon he made between twenty and thirty copies of the monthly movie listing using 8-1/2 by 11 inch plain paper. (Baum Dep. at 63.) At around 1:15 p.m. he ran approximately eighty additional copies of the movie list, again on plain paper. (Baum Dep. at 62-65.) Shortly after starting the

eighty copies, Baum left for the day, leaving the copier running unattended. He intended to retrieve the copies the following morning. (Baum Dep. at 62.) None of the other employees testified to using the copier after 1:30 p.m. on the day of the fire.

Both Baum and Kinder were cigarette smokers at the time the fire occurred. Baum did not recall whether he had smoked in the storage room that day, but thought that he might have smoked in the office adjacent to the storage room. He believed it more likely that he had smoked outside with a woman who worked in the nearby tanning salon. (Baum Dep. at 65-68.) Kinder testified that he smoked a cigarette in a back hallway, which he claimed was designated for employee smoking, sometime between 5:00 p.m. and 8:00 p.m. (Pls.' Joint Aff. Ex. 25, Kinder Dep. at 10-11, 20-21.) He denied smoking in the storage room or the office on the day of the fire. (Kinder Dep. at 42.)

**B. The Copier**

Home Video purchased the copier, a Canon Model NP 6016, in September of 1995. (Pls.' Joint Aff. Ex. 16, Site Profile at 1.) Service records indicate that it was installed that month and was subsequently upgraded in some manner in September of 1998. The records also indicate that the copier was serviced one week before the fire, on October 9, 2000. (Pls.' Joint Aff. Ex. 16, 18 Month Svc. Hist. at 1.) Baum, who was the primary user of the copier, stated that the copier frequently jammed when making copies of the

video cassette jackets on heavy weight paper, but that it never jammed while he was running 8-1/2 by 11 inch plain paper copies. (Baum Dep. at 41, 55.) Home Video manager Dan Pulanco ("Pulanco") also used the copier regularly. (Pls.' Joint Aff. Ex. 13, Pulanco Dep. at 24-25.) He also noted frequent jams when running heavier stock paper and recalled that the copier had jammed once when he was running 8-1/2 by 11 inch plain paper. (Pulanco Dep. at 22-24.)

Baum testified that sometimes he was able to correct the jam himself and resume copying. In other cases, he was unable to clear the jam and would report the problem to Pulanco. (Baum Dep. at 51-53.) Baum indicated that Pulanco was able to clear most of the jams, but in some instances it was necessary to call a service technician to correct the problem. (Baum Dep. at 52.) The copier was installed and serviced by IKON Office Solutions. (Pls.' Joint Aff. Ex. 16.)

**C. The Investigation**

After the fire, several investigators concluded that the fire originated in the storage room, in or near the copy machine. In his official report, St. Paul Fire Department investigator James Novak reported that based on witness statements, burn patterns and damage to the storage room and copier, "the copy machine is the most probable cause of this fire." (Pls.' Joint Aff. Ex. 1, Novak Report at 13.) Similarly, three independent fire investigators retained by plaintiffs, Robert Whitemore, Mark Bishop and Chuck

Knife, each examined the scene and interviewed witnesses. (Pls.' Joint Aff. Ex. 5, 15 and 26.) After ruling out other possible sources of ignition, each concluded that the fire started in the storage room, in or near the copier. However, none of these four investigators offered an opinion as to how the copier started the fire.

Plaintiffs also sought the expert opinions of Beth Anderson of Anderson Engineering of New Prague, Inc. ("Anderson") and consultant Michael Wald of Investigative Engineering Incorporated ("Wald") regarding the cause of the fire. Both submitted initial expert reports on October 31, 2002. In her report, Anderson concluded that the fire was caused by a design or manufacturing defect in the control circuitry of the upper fixing heater assembly of the copier.[2] She specifically opined that the design was defective because it included a type of thermal fuse that under certain circumstances could allow the fixing assembly to overheat and cause a fire. (Pls.' Joint Aff. Ex. 4, Anderson Expert Statement at 2.) Wald's report included the same conclusion, stating that as designed in the subject copier, the thermal fuse "is useless as a safety device." (Pls.' Joint Aff. Ex. 21, Wald Investigation Report at 3.)

---

[2] The fixing assembly uses heat to cause toner to adhere to the blank paper, creating the copied image. (Pls.' Joint Aff. Ex. 12, Canon Service Manual at 2-7.)

After defendant's expert, Lawrence Sacco ("Sacco") of Affiliated Engineering Laboratories, Inc., filed an expert report challenging Anderson's and Wald's opinion, Anderson submitted a report entitled "Expert Statement of Rebuttal Opinions" on March 14, 2003. Wald filed a subsequent investigation report on March 17, 2003. In her rebuttal report, Anderson reiterated that investigation of the site eliminated other potential points of origin in the storage room. (Pls.' Joint Aff. Ex. 13, Anderson Rebuttal Report at 1.) Anderson then challenged the conclusions set forth in the Sacco report. (Anderson Rebuttal Report at 3-4.) Finally, Anderson raised a second potential defect in the copier, suggesting that the composite power supply board may have failed in some way and caused the fire.[3] (Anderson Rebuttal Report at 4.) Wald's second report likewise challenged Sacco's opinions and reasserted that the design of the thermal fuse protection for the upper fixing assembly was defective. (Pls.' Joint Aff. Ex. 22, 2d Wald Investigation Report at 2.) Wald joined Anderson in raising the new allegation of a possible defect associated with the

[3] In November of 2002, United States Magistrate Judge Jonathan Lebedoff granted plaintiffs' motion to compel discovery regarding previous Canon copier fires and known defects related to the power cord, power supply and printed circuit boards. (Order of November 6, 2002, Docket No. 67.) In March 2003, plaintiffs sought to compel additional discovery in order to further investigate their newly raised theory that the composite power supply board was the cause of the fire. That motion was denied as untimely, involving components beyond defendant's control and improperly raised because the information had not been sought in ordinary discovery. (Order of March 25, 2003, Docket No. 79.)

composite power supply board.[4] (2d Wald Investigation Report at 5.)

The expert opinions of Anderson and Wald are the focus of defendant's motion for summary judgment. Defendants contend that the opinions are too speculative and unreliable to be considered by a jury. Defendants further assert that without the unreliable expert opinion evidence, plaintiffs' claims cannot survive summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no

---

[4] Wald subsequently averred by affidavit that "various components [on the composite power supply board] are not properly protected from overcurrent events insofar as the fuse rating far exceeds the rating of the components in the circuit." (Wald Aff. at ¶ 12.) However, plaintiffs proffer no evidence that an overcurrent event actually occurred or that this alleged defect caused the Home Video fire. Because it lacks evidentiary support in the record, the court does not address the experts' second theory, except to note that it casts significant doubt upon assumptions underlying their primary theory, as further discussed below.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23.

**II. Essential Elements of Plaintiffs' Claims**

Under Minnesota law, plaintiffs alleging strict products liability based on defective design or manufacturing must prove by a preponderance of the evidence that the product was defective and unreasonably dangerous when it left defendant's control and that the defect caused the harm alleged. See Lee v. Crookston Coca-Cola

Bottling Co., 188 N.W.2d 426, 432 (Minn. 1971) (citing Restatement (Second) of Torts § 402A). Plaintiffs need not prove negligence or fault on the part of the manufacturer. See id., 188 N.W.2d at 432. Generally, a product may be proven defective by circumstantial evidence, but where substantial time has past since the product left defendant's control, it is often difficult to show circumstantially that the product was more likely than not defective when it left defendant's control. See Western Sur. and Casualty Co. v. General Electric Co., 433 N.W.2d 444, 447 (quoting Holkestad v. Coca-Cola Bottling Co., 180 N.W.2d 860, 863 (Minn. 1970) and citing Smith v. Runk, 425 N.W.2d 299, 301 (Minn. Ct. App. 1988)). Nonetheless, plaintiffs must show it probable that the defect existed at the time of sale and was not caused by later mishandling or misuse. See Lee, 188 N.W.2d at 432.

A claim of negligent design or manufacturing requires a showing that the manufacturer failed to use reasonable care in the design or manufacture of the product to protect against an unreasonable risk of harm resulting from the intended use of the product. See McCormack v. Hankscraft Co., Inc., 154 N.W.2d 488, 496 (Minn. 1967).

The elements of a claim of breach of warranty include a showing that defendant made an express or implied representation material to the transaction, that plaintiff, reasonably relying on that representation was induced to enter the transaction, that the

representation was false and that plaintiff was thereby harmed. See Alley Const. Co., Inc. v. State, 219 N.W.2d 922, 926 (Minn. 1974).

**III. Expert Testimony**

Plaintiffs seek to prove the existence of a defect circumstantially through expert testimony. Expert opinion testimony is controlled by Fed. R. Evid. 702 and cases interpreting the rule. See, e.g., Kumho Tire v. Carmichael, 526 U.S. 137, 141 (1999); General Electric Co. v. Joiner, 522 U.S. 136, 141 (1997); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588 (1993). Rule 702 imposes upon the district court a duty to ensure that all expert opinion testimony is relevant, reliable and will be helpful to the fact finder. See Fed. R. Evid. 702; Kuhmo Tire, 526 U.S. at 149; Joiner, 522 U.S. at 140. Given the broad range of possible expert opinion testimony, this reliability inquiry is necessarily flexible and the court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kuhmo Tire, 526 U.S. at 152. The court must consider the factual issues raised by the controversy and determine whether the expert's approach is a reasonable means of drawing conclusions about those relevant facts. See id. at 150, 154. The relevant inquiry is whether the expert could reliably determine the cause of the harm alleged. See id. at 154.

Under Daubert, the court must consider whether the expert applied a generally accepted methodology in reaching the proffered opinion. See Daubert, 509 U.S. at 593-94. The National Fire Protection Association ("NFPA") has promulgated Standard 921, entitled "Guide for Fire and Explosion Investigations," which establishes an accepted methodology for investigating fires. It requires that "any hypothesis formed from an analysis of the data collected in an investigation must stand the challenge of reasonable examination." NFPA 921 § 12-6 at 921-79. NFPA 921 specifically cautions investigators against forming unsupported presumptions and requires that hypotheses be based on empirical data. See id. §§ 2-3.5 - 2-3.6.1 at 921-10. The court finds that the opinions expressed by Anderson and Wald do not meet the methodological requirements established by Daubert, Kumho and NFPA 921.

In their expert reports, Anderson and Wald draw two principal conclusions. First, they believe that the fire originated in the Canon copier. Second, they assert that the thermal fuse intended to prevent the fixing assembly from overheating was defectively designed and failed to prevent the Home Video fire. They base the first conclusion on the reports of the fire origin experts, their own review of the burn patterns in the storage room, the interviews of the witnesses, the pattern of damage within the copier itself and their elimination of other possible ignition sources in the

storage room. (Anderson Expert Statement at 2; Wald Investigation Report at 3.)

Anderson and Wald base their second conclusion, that the copier was defectively designed, on burn patterns inside the copier in the area where the fixing assembly is located and from tests Anderson performed on exemplar fixing assemblies.[5] In two of those tests, the fixing assembly was tested outside the copier. Plain paper was placed in direct contact with the assembly, the copier's control circuitry was bypassed and current was applied to the fixing assembly. The assembly became hot enough to scorch the paper where it was touching the fixing assembly before either the fixing assembly cracked or the thermal fuse opened and cut off the power. (Anderson Rebuttal Report at 2-3.) No open flame was created in either of the tests. The third test was similar to the first two, but the assembly was tested inside the copier. Again the control circuitry was bypassed and current was applied directly to the assembly. After approximately five minutes, the paper was

---

[5] Anderson originally claimed that, within a reasonable degree of engineering certainty, it was her opinion that the fire started when a defectively designed thermal fuse failed to prevent the fixing assembly from overheating following an unknown failure in the control circuitry. (Anderson Expert Statement at 2; Anderson Dep. at 108-09.) However, she later changed that opinion, stating that the fixing assembly overheating was just one of the ways the fire could have started. She stated that a failure in the composite power supply board may have caused the fire instead, in which case the allegedly defective design of the thermal fuse would have had nothing to do with it. (Branson Aff. Ex. A, 2d Anderson Dep. at 89-91.)

scorched, although again no open flame was observed. The thermal fuse did not cut off power to the fixing assembly before the paper was scorched. (Anderson Rebuttal Report at 3.)

The court finds the experts' opinions, based on these tests, unreliable and potentially confusing to the jury. They are unreliable because they presume a catastrophic failure in the control circuitry but fail to show either the cause or the likelihood of such failure. The tests show, at most, what might occur if all the control circuitry failed and power was delivered to the fixing assembly. They do not show how, why or under what circumstances the control circuits could fail, much less that they did so in this case.[6]

---

[6] Anderson could not point to any defect in the control circuitry and she admitted that she assumed the control circuits had failed because the fire had taken place and burn patterns in the copier suggested to that it originated in the area of fixing assembly. (Def.'s Addendum Ex. 23, Anderson Dep. at 15-16.) However, by later testifying that the fire could have started in area of the composite power supply board, she eliminated the sole basis for that assumption. (Pls.' Joint Aff. Ex. 3, 2d Anderson Dep. at 89-91.)

Similarly, Wald could not identify a particular defect or cause for the alleged control circuit failure. He stated that "all electronics at some time or other can fail. It's just the nature of the beast. That's why the design and implementation of proper safety devices is essential." (Def.'s Addendum Ex. 20, Wald Dep. at 28.) When asked if the control circuitry had redundant safety systems in place, Wald replied, "I suspect there is some redundancy, but, obviously, there's not enough or there's inadequate redundancy to insure this type of situation won't occur." (Wald Dep. at 28-29.) Clearly, Wald concluded that a control circuit failure had occurred, yet the only evidence that such a failure had taken place is the hypothesized overheating of the fixing assembly.

Anderson and Wald began by hypothesizing that the fixing assembly overheated. They then assumed that the control circuit failed, because they believed that was the only way the fixing assembly could have overheated. Yet the only evidence supporting their assumption that the control circuitry failed was the hypothesized overheating of the fixing assembly. It is neither logically nor scientifically sound to say that the hypothetical proves the assumed or that the assumed proves the hypothetical. Anderson's experiments show at most that it is possible for the fixing assembly overheat if the control circuitry is bypassed. The experiments do not demonstrate that the control circuitry failed in this case. Therefore, the experts' hypothesis does not "stand the challenge of reasonable examination." NFPA 921 § 12-6 at 921-79 (citing Daubert, 509 U.S. 579).

In addition to proving the existence of a defect, plaintiffs also bear the burden of proving that the defect caused the alleged harm. See Lee, 188 N.W.2d at 432. Without evidence making it more probable than not that the control circuitry failed, plaintiffs cannot demonstrate by a preponderance of the evidence that the allegedly defective thermal fuse design caused the fire. While the sufficiency of the factual underpinning of expert opinion testimony generally goes to the weight rather than the admissibility of the evidence, "there must be sufficient facts already in evidence or disclosed by the witness as a result of his investigation to take

such testimony out of the realm of guesswork and speculation." Polk v. Ford Motor Co., 529 F.2d 259, 271 (8th Cir. 1976). Because the experts' opinions rely on an assumption for which there is no evidentiary basis, they are speculative and unreliable. Moreover, the experts cast doubt on the assumption upon which their theory rests when they suggest that the fire may have been caused by the composite power supply board and that the fixing assembly and thermal fuse may have had nothing to do with it after all. (2d Anderson Dep. at 89-91; Wald Aff. at 3.)

The court also finds that expert opinion testimony based on the tests Anderson performed would be confusing to the jury. In addition to its gatekeeping function under Rule 702, the court has a duty to prevent confusing evidence from reaching the jury. See Fed. R. Evid. 403; Joiner, 522 U.S. at 148 (Breyer, J, concurring). "The closer the experiment gets to simulating the accident, the more similar the conditions of the experiment must be to the accident conditions." McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1402 (8th Cir. 1994). Although Anderson claims the tests were not an attempt to recreate the actual cause of the fire, they appear to do so without accounting for the cause of the presumed control circuit failure. The tests come too close to "simulating the accident" under conditions that are not similar enough to those existing on October 16, 2000. Id. Therefore, the tests could lead to juror confusion.

The experts' opinions suffer other infirmities. In order for there to have been power running to the fixing assembly, the copier would have to have run out of paper or jammed during the 1:30 p.m. job. (Anderson Dep. at 108-09.) Either of those events would leave the copier in an energized mode with power flowing to, but not through, the fixing assembly until the unspecified control circuit failure allowed the assembly to overheat. However, if the copier had run out of paper, there would not have been paper close enough to the fixing assembly to ignite.[7] Alternatively, they suggest that a paper jam during the 1:30 p.m. job might have left paper touching or close to the fixing assembly. (Anderson Dep. at 109.) That suggestion is both speculative and contrary to the evidence that there had been only one plain paper jam in over five years. While the experts' theory is possible, it cannot be deemed probable without material evidentiary support. Therefore, the experts' opinions do not support a finding that the copier was defective and that the defect more likely than not caused the fire.

In short, the circumstantial evidence that, after five years in service, the fire started at or in the vicinity of the copier does not demonstrate that the copier was defective. The expert testimony that the thermal fuse design was defective does not

---

[7] Wald testified that paper would likely have to be touching or at least within one sixteenth of an inch of the fixing assembly in order to ignite. He also noted that it was improbable that a single piece of paper could have started the October 16, 2000 fire. (Wald Dep. at 117.)

demonstrate that the alleged defect caused the fire, because there is no evidence that a total failure of the control circuit occurred in this instance. Therefore, the expert opinions proffered by plaintiffs fail to support a prima facie showing of a defect existing at the time the copier left defendant's control, or that such defect caused the Home Video fire. These are necessary elements of claims of strict products liability, negligence and breach of warranty. Where a party fails to support an essential element of a claim, summary judgment is appropriate. See Celotex, 477 U.S. at 322-23.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 85] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 16, 2003

David S. Doty, Judge
United States District Court